UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA        :

           -v-                  :     **INFORMATION**

RICHARD VECCHIA,                :     08 Cr.

           Defendant.           :

- - - - - - - - - - - - - - - - -x



### COUNT ONE

(Conspiracy To Falsify Books, Records And Accounts)

The United States Attorney charges:

BACKGROUND

1. As set forth more fully below, from in or about January 2002 to in or about February 2003, RICHARD VECCHIA, the defendant, participated in a conspiracy to violate the federal securities laws by, among other things, knowingly submitting false audit confirmation letters in connection with the audits of U.S. Foodservice ("USF"), a wholly-owned subsidiary of Royal Ahold, N.V., a publicly-traded company ("Ahold").

Relevant Persons And Entities

2. At all times relevant to this Information, Ahold was a public company headquartered in The Netherlands. Ahold conducted the majority of its business operations - the commercial and retail sale of food and food-related products - through subsidiaries and partnerships located primarily in the United States and Europe.

3. At all times relevant to this Information, Ahold's common shares traded in the United States in the form of American Depositary Shares ("ADSs"), and were evidenced by American Depositary Receipts ("ADRs"). Ahold's ADRs traded on the New York Stock Exchange under the symbol "AHO" and were registered with the United States Securities and Exchange Commission ("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act").

4. At all times relevant to this Information, USF, a corporation organized under the laws of the State of Delaware, was a wholly-owned subsidiary of Ahold, and maintained its headquarters in Columbia, Maryland. USF was engaged in the business of purchasing, marketing, selling and delivering food and food-related products to commercial customers across the United States. USF purchased such products from a variety of suppliers (also referred to herein as "vendors").

5. At all times relevant to this Information, Ahold was required to comply with the provisions of the federal securities laws, including the Exchange Act and regulations promulgated thereunder, that were designed to ensure that each company's financial information was accurately recorded and disclosed to the public. Under these provisions, Ahold and/or its subsidiaries were required, among other things, to: (a) file with the SEC annual financial statements (on SEC Form 20-F) that

had been audited by a public accountant; (b) make and keep books, records, and accounts that accurately and fairly reflected USF's and Ahold's business transactions; and (c) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that USF's and Ahold's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

6. As a wholly-owned subsidiary of Ahold, the results of USF's operations were consolidated, for purposes of public financial reporting, with the results of Ahold's other subsidiaries and operating companies. The financial information contained in USF's books, records and accounts was a material part of Ahold's consolidated financial information.

7. At all times relevant to this Information, Mark Kaiser, a co-conspirator not named as a defendant herein, was a senior executive at USF with extensive experience in the food distribution industry. Among other things, Kaiser served as USF's Executive Vice President for Sales, Marketing and Procurement, and later as USF's Chief Marketing Officer.

8. At all times relevant to this Information, William Carter, a co-conspirator not named as a defendant herein, worked at USF. From in or about 1999 through in or about early 2003, Carter held the position of Vice President for Purchasing at USF.

In that capacity, Carter was responsible for USF's purchasing activities with respect to certain products, as well as USF's relationships with certain vendors.

9.  At all times relevant to this Information, Sugar Foods Corporation ("Sugar Foods") was a company organized under the laws of the State of New York, with its headquarters in New York, New York. Among other things, Sugar Foods was engaged in the business of selling and marketing packaged dry goods, including sugar and sugar substitutes to wholesale food distributors. USF was one of Sugar Foods' largest customers.

10. From in or about the early 1990s through the present, Michael Hannigan, a co-conspirator not named as a defendant herein, worked at Sugar Foods. In or about 2002 and 2003, Hannigan held the position of Regional Sales Manager at Sugar Foods, and was primarily responsible for Sugar Foods' business relationship with USF, and the sale of Sugar Foods' products to USF.

11. At all times relevant to this Information, RICHARD VECCHIA, the defendant, held the position of National Sales Manager, Vice President of Food Service Sales at Sugar Foods, and was Hannigan's direct supervisor.

<u>Promotional Allowances</u>

12. The vendors that supplied food and food-related products to USF often participated with USF in "promotional

4

allowance" programs.  Under such programs, USF paid the full price for the products that it purchased from a particular vendor, but was later paid a negotiated rebate by the vendor.  These rebates were known as promotional allowances, or "PAs."

13.  USF's purchase price for the products USF later sold to its customers was recorded in USF's books, records, accounts, and financial statements as part of "cost of sales."  PAs paid by vendors reduced USF's costs of sales.  Because PAs reduced USF's costs, they had the direct effect of increasing USF's earnings, and Ahold's consolidated earnings.  PAs were often referred to at USF as "promotional allowance income," or "PA income."  The PA income accrued and recorded at USF, but not yet collected, was accumulated in a PA receivable account, and recorded as an asset in USF's and Ahold's books and records.

14.  If USF overstated the value of its PA income, that overstatement had the following effects, among others, in the reporting period for which the overstatement was made: (a) USF's cost of sales would decrease by the amount of the overstatement and, consequently, its earnings would increase by that same amount; and (b) the value of USF's assets, specifically its PA receivables, would increase, also by the amount of the overstatement.  Because USF was a wholly-owned subsidiary of Ahold as of in or about April 2000, any such overstatement by USF had the same effects on Ahold's books, records, accounts, and

5

financial statements.

15. At all times relevant to this Information, Sugar Foods participated with USF in a promotional allowance program. Under this program, USF paid an agreed-upon price for the products it purchased from Sugar Foods, but was later paid a promotional allowance by Sugar Foods, based, among other things, upon the volume of products USF purchased during a given time period.

<u>Audits Of USF's And Ahold's Books, Records And Accounts</u>

16. At all times relevant to this Information, USF and Ahold employed independent auditors to perform year-end audits of USF's and Ahold's financial statements. Such audits involved the inspection of USF's and Ahold's books, records and accounts for the purpose of verifying the accuracy and completeness of such records.

17. As part of the year-end audit process, and prior to the public reporting of Ahold's and USF's annual results, independent auditors endeavored to confirm the earned PA income and PA receivable amounts recorded in USF's books, records and accounts. To accomplish this goal, auditors sent audit confirmation letters to USF's vendors, including Sugar Foods, who were asked to independently verify, among other things: (a) the total amount of PA income earned by USF from the vendor during the prior fiscal year; and (b) the amount of PA income owed by

6

the vendor to USF at the end of that year - *i.e.*, the difference between the amount of PAs that USF had earned from the vendor and what USF had been paid.

### THE SCHEME TO CREATE FALSE BOOKS, RECORDS AND ACCOUNTS

18. From in or about January 2002 to in or about February 2003, RICHARD VECCHIA, the defendant, along with Kaiser, Carter, Hannigan and others known and unknown, participated in a scheme to create books, records and accounts at USF and Ahold that contained false entries with respect to: (a) the PA income purportedly earned by USF from Sugar Foods during the fiscal years ending December 29, 2001 and December 28, 2002; and (b) the PA balance purportedly owed to USF by Sugar Foods as of December 29, 2001 and December 28, 2002.

#### Fiscal Year 2001

19. In or about December 2001 or January 2002, as part of the scheme to create false books, records and accounts, Kaiser and others at USF made and caused others to make entries in various books and records, which entries falsely represented that: (a) USF had earned from Sugar Foods approximately $5.44 million in PAs during the fiscal year ending December 29, 2001, when, in truth and in fact, USF had earned less than $1.6 million in PAs; and (b) Sugar Foods owed USF approximately $5.1 million in PAs as of December 29, 2001 when, in truth and in fact, Sugar Foods owed USF less than $200,000.

20. In or about January 2002, as further part of the scheme to create false books, records and accounts, Kaiser and others at USF prepared and caused to be prepared an audit confirmation letter addressed to Sugar Foods (the "2001 Sugar Foods Confirmation Letter"), which letter falsely represented that: (a) USF had earned from Sugar Foods approximately $5.44 million in PAs during the fiscal year ending December 29, 2001; and (b) Sugar Foods owed USF approximately $5.1 million in PAs as of December 29, 2001.

21. In or about late January or early February 2002, Kaiser caused auditors to send the 2001 Sugar Foods Confirmation Letter to Michael Hannigan requesting that Hannigan confirm, among other things, the false financial information set forth above in Paragraph 19.

22. In or about late January or early February 2002, Hannigan consulted with RICHARD VECCHIA about the 2001 Sugar Foods Confirmation Letter. VECCHIA and Hannigan discussed the fact that the financial information contained in the 2001 Sugar Foods Confirmation was false. Nevertheless, VECCHIA consented and approved having Hannigan confirm such false financial information to USF's auditors.

23. On or about February 8, 2002, in furtherance of the scheme, at the request of Kaiser and Carter, and with the consent and approval of RICHARD VECCHIA, the defendant, Michael

8

Hannigan signed the 2001 Sugar Foods Confirmation Letter without exception and returned that letter to USF's and Ahold's independent auditors, thereby falsely confirming, among other things: (a) that USF had earned from Sugar Foods approximately $5.44 million in PAs during the fiscal year ending December 29, 2001, when, as VECCHIA and Hannigan well knew, the $5.44 million figure was grossly overstated and USF had not earned that amount; and (b) that Sugar Foods owed USF approximately $5.1 million in PAs as of December 29, 2001, when, as VECCHIA and Hannigan well knew, the $5.1 million figure was grossly overstated and Sugar Foods did not owe that amount.

Fiscal Year 2002

24. In or about December 2002 or January 2003, as part of the scheme to create false books, records and accounts, Kaiser and others at USF made and caused others to make entries in various books and records, which entries falsely represented that: (a) USF had earned from Sugar Foods approximately $13.15 million in PAs during the fiscal year ending December 28, 2002, when, in truth and in fact, USF had earned less than $4.2 million in PAs; and (b) Sugar Foods owed USF approximately $9.75 million in PAs as of December 28, 2002 when, in truth and in fact, Sugar Foods did not owe USF any money for PAs as of that date.

25. In or about January 2003, as further part of the scheme to create false books, records and accounts, Kaiser and

9

others at USF prepared and caused to be prepared an audit confirmation letter addressed to Sugar Foods (the "2002 Sugar Foods Confirmation Letter"), which letter falsely represented that: (a) USF had earned from Sugar Foods approximately $13.15 million in PAs during the fiscal year ending December 28, 2002; and (b) Sugar Foods owed USF approximately $9.75 million in PAs as of December 28, 2002.

    26.  In or about late January or early February 2003, Kaiser caused auditors to send the 2002 Sugar Foods Confirmation Letter to Michael Hannigan at Sugar Foods requesting that Hannigan confirm, among other things, the false financial information set forth above in Paragraph 24.

    27.  In or about late January or early February 2003, Hannigan consulted with RICHARD VECCHIA about the 2002 Sugar Foods Confirmation Letter.  VECCHIA and Hannigan discussed the fact that the financial information contained in the 2002 Sugar Foods Confirmation was false.  Nevertheless, VECCHIA consented and approved having Hannigan confirm such false financial information to USF's auditors.

    28.  On or about February 5, 2003, in furtherance of the scheme, at the request of Kaiser and Carter, and with the consent and approval of RICHARD VECCHIA, the defendant, Michael Hannigan signed the 2002 Sugar Foods Confirmation Letter without exception and returned that letter to USF's and Ahold's

independent auditors, thereby falsely confirming, among other things: (a) that USF had earned from Sugar Foods approximately $13.15 million in PAs during the fiscal year ending December 28, 2002, when, as VECCHIA and Hannigan well knew, the $13.5 million figure was grossly overstated and USF had not earned that amount; and (b) that Sugar Foods owed USF approximately $9.75 million in PAs as of December 28, 2002, when, as VECCHIA and Hannigan well knew, the $9.75 million figure was grossly overstated and Sugar Foods did not owe that amount.

## THE CONSPIRACY

29. From in or about January 2002 to in or about February 2003, RICHARD VECCHIA, the defendant, unlawfully, willfully and knowingly did combine, conspire, confederate, and agree with Kaiser, Carter, Hannigan and others known and unknown, to commit an offense against the United States, namely, to violate Sections 78m(b)(2)(A), 78m(b)(5) and 78ff of Title 15 of the United States Code, and Section 240.13b2-1 of Title 17 of the Code of Federal Regulations.

30. It was a part and an object of the conspiracy that RICHARD VECCHIA, along with Kaiser, Carter, Hannigan and others known and unknown, unlawfully, willfully, and knowingly would and did, directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Exchange Act, namely books, records, and accounts of Ahold, an

11

issuer with a class of securities registered pursuant to the Exchange Act, which USF and Ahold were required to make and keep in reasonable detail, accurately and fairly reflecting the transactions and dispositions of the assets of Ahold, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

<u>Means And Methods Of The Conspiracy</u>

31. Among the means and methods by which RICHARD VECCHIA and his co-conspirators would and did carry out the conspiracy were the following:

    a. Kaiser and others at USF made false statements to auditors;

    b. Kaiser and others at USF made and caused others to make false entries in USF's books, records and accounts;

    c. Kaiser prepared and caused to be prepared audit confirmation letters that contained false information;

    d. RICHARD VECCHIA knowingly approved the signing of audit confirmation letters that contained false information; and

    e. Hannigan signed audit confirmation letters that contained false information.

Overt Acts

32.  In furtherance of the conspiracy and to effect its illegal object, RICHARD VECCHIA and his co-conspirators committed the following overt acts, among others:

a.  On or about January 23, 2002, Kaiser signed the 2001 Sugar Foods Confirmation Letter on behalf of USF;

b.  In or about late January 2002, Kaiser caused USF's auditors to send the 2001 Sugar Foods Confirmation Letter to Hannigan;

c.  In or about early February 2002, VECCHIA spoke with Hannigan about the 2001 Sugar Foods Confirmation Letter during an interstate telephone call;

d.  In or about early February 2002, VECCHIA spoke with Carter about the 2001 Sugar Foods Confirmation Letter during an interstate telephone call;

e.  On or about February 8, 2002, Hannigan countersigned the 2001 Sugar Foods Confirmation Letter and returned it to auditors through interstate wire and mail;

f.  On or about January 22, 2003, Kaiser signed the 2002 Sugar Foods Confirmation Letter on behalf of USF;

g.  In or about late January 2003, Kaiser caused USF's auditors to send the 2002 Sugar Foods Confirmation Letter to Hannigan;

h.  In or about late January or early February

13

2003, VECCHIA spoke with Hannigan about the 2002 Sugar Foods Confirmation Letter during an interstate telephone call;

        i. On or about February 4, 2003, Carter signed a side letter addressed to Hannigan representing that Sugar Foods did not owe USF $9.75 million as of December 28, 2002; and

        j. On or about February 5, 2003, Hannigan countersigned the 2002 Sugar Foods Confirmation Letter and returned it to auditors through interstate wire and mail.

(Title 18, United States Code, Section 371.)

_____
MICHAEL J. GARCIA
United States Attorney